HANNA v. OLIVER IRON MINING CO.

1. EVIDENCE—JUDICIAL NOTICE—INLAND LAKE LEVELS.
   It is common knowledge that the level of inland lakes in this
   State has varied much in recent years.

2. WATERS AND WATERCOURSES—RAISING LEVEL OF INLAND LAKE—
   INJUNCTION.
   Where, in suit by owner of lots fronting on inland lake to
   enjoin mining company and city from pumping water into
   lake, plaintiff's claim that level of lake was thus raised above
   its natural level was not supported by preponderance of proof,
   decree of court below dismissing plaintiff's bill was proper.

Appeal from Dickinson; Stone (John G.), J., pre-
siding. Submitted April 10, 1930. (Docket No. 50,
Calendar No. 34,885.)  Decided June 2, 1930.

Bill by Jennie E. Hanna against Oliver Iron Min-
ing Company, a Minnesota corporation, defendant,
and the City of Iron Mountain, intervening defend-
ant, to enjoin raising the level of lake. From a de-
cree dismissing the bill, plaintiff appeals. Affirmed.

*Derham & Derham,* for plaintiff.

*Chas. M. Humphrey* and *Symonds & Rahm,* for
defendant.

*Daniel J. O'Hara,* for intervening defendant.

SHARPE, J.   Plaintiff is the owner of Hanna's
First Addition to the city of Iron Mountain.  She
purchased this land in 1913, and platted it in 1925.
It has a frontage of 350 feet on the westerly side of
Lake Antoine, a small, shallow lake about a mile and

a quarter in length and a mile wide, dependent upon springs and rainfall to maintain its level.

On January 1, 1924, the city purchased from a private corporation a waterworks plant, which had supplied the city with water for many years. Additional mains and extensions and a filtering plant were added. The total cost was $540,000, for which bonds were issued. In 1921, a motor company plant was established near the city. Its population has almost doubled since that time. Many new plats have been recorded, among them that of plaintiff.

In 1924, when the purchase was made, the water in the lake was at a very low level, due to an increase in the quantity used by the city and to a very light rainfall in that and the preceding year, and the water therein became somewhat stagnant. There was talk of getting water from the Menominee river, some little distance away. Finally, a contract was entered into between the city and the defendant mining company, under the terms of which the company installed a pump in the nearby Chapin mine at a cost of more than $5,000, and agreed to pump the water therefrom and deliver it in a 16-inch pipe at the top of the mine; the city to convey it by pipe to Lake Antoine. More than $25,000 was expended by the city in doing so. This work was completed about September 9, 1925, and since that time the mining company has pumped the water from the mine into the lake whenever requested to do so by the city.

It is the plaintiff's claim that the water in the lake has been raised thereby above its natural level to such an extent that six of the lots in her plat have been rendered "unfit for use, uninhabitable, unsalable and worthless for any purpose." In her bill of complaint, filed against the mining company, she

prays that it be enjoined from pumping any water into the lake and thus raising the water thereof above its natural level.

By consent of the parties, the petition of the city for leave to intervene was granted, and it filed an answer denying that the water pumped from the mine had raised the water in the lake above its natural level.

The proofs were taken in open court. The trial judge filed an exhaustive opinion, in which the facts are stated at greater length, and concluded that plaintiff had not sustained the allegations in her bill of complaint, and dismissed the same. Plaintiff has appealed.

Plaintiff's right to relief, as stated in her bill of complaint and by her counsel in their brief, is based upon the claim that the pumping of the water from the mine into the lake has raised it "above its average level." The finding of tne court that "the proofs do not sustain this allegation" was arrived at after a careful review of the evidence submitted. Quoting from his opinion:

"The court is impressed with the fact that what has happened is simply this: Mrs. Hanna platted her addition at a time of abnormally low water in April, 1925. In platting it she platted lots 11, 12, 13, 14 and part of 24, part of Hanna Court, practically all of Water street, and all of outlot A, beyond the limits of Kimberly's Fifth Addition, so that outlot A and part of Water street lie within the meander line and were relicted land at the time of the platting. In platting at this time of abnormally low water, this land was dry and in grading Hanna Court, she cut through the artificial embankment constructed years before by Jones, with the result that when the water was restored to its

natural level by replenishment the water flowed through the gap thus made by her in this artificial embankment and onto part of lots 11, 12, 13, 14 and 24, and also onto the foot of Hanna Court. Outlot A always was a marsh in its substantial entirety, was never deemed fit for residential purposes, and was so designated for these reasons by Israelson at the time he made the plat, as an outlot."

It is common knowledge that the level of inland lakes in this State has varied much in recent years. The cause therefor need not be discussed. Thomas Polkinghorn, a resident of the city for 45 years, and a former employee of plaintiff's grantor, and familiar with the land in her plat, testified that the water in the lake at the time of the trial was one foot lower than in 1905. Charles Hallman, postmaster, a lifelong resident of the city, testified that in that year (1905) the part of plaintiff's plat designated the "outlot" was then "nothing but swamp and marsh, and at that time there was box elders growing in there—and regular swamp land." He examined it the day of the trial, and testified that "the water is a foot lower now than it was in 1905, from my observation." There was much other proof that the water in the lake was not higher than in many other years.

The records disclose that the elevation of the surface of the lake when survey was made in 1898 by the United States Geological Survey was 1,157.6 feet above sea level. A survey made three days before the hearing disclosed the elevation of the water to be 1,157.5. The rainfall much varied. The greatest amount was 36.58 inches in 1916, and the least was 24.23 inches in 1924 and 21.72 in 1925, when plaintiff's plat was made.

The use which the city makes of the water in the lake in no way necessitates the raising of it above

its normal level. While the mining company pumps the water from the mine whenever requested by the city to do so, it receives no compensation for such service, and there is no apparent reason why either of the defendants should seek to raise the water of the lake above its natural level. The pumping simply supplies that which the city uses, and, as disclosed by the surveys made from time to time, the natural level of the water in the lake is thus fairly maintained.

In our opinion, the plaintiff's claim in this respect is not supported by a preponderance of the proof. The other defenses which were interposed by the city need not be considered.

The decree is affirmed, with costs to appellees.

WIEST, C. J., and BUTZEL, CLARK, McDONALD, POTTER, NORTH, and FEAD, JJ., concurred.